Wright, J.
On the 10th of March, 1869, Mary J. Manson, by her next friend, Henry J. Eaton, filed in the court of common pleas, Delaware county, her petition to recover damages for a personal injury.
Upon the first trial, in April, 1870, the jury disagreed. At the trial, November, 1870, the jury returned a verdict for plaintiff in the sum of $7,000. A second trial was-taken, which resulted in a verdict of $12,000, at the November term, 1871. Upon direction of the court, $3,000 of this sum was remitted. A motion for a new trial was overruled, and a bill of exceptions taken, embodying all the testimony. A petition in ei'ror was filed in the district court, which was reserved to the supreme court for decision.
The plaintiff, Mary J. Manson, was a child about eight or nine years of age, and upon the 7th October, 1867, with her mother, took passage on defendant’s cars at Crest-line for Columbus. The mother bought a ticket for herself, but hone for the child, though it is admitted that both were passengers.. The train was the New York and Western Express, and upon this occasion consisted of three passenger coaches, baggage car, and several express freight cars, besides locomotive and tender. Plaintiff and her mother, by mistake, went into the forward passenger coach. This was the smoking-car. It was the day before the October election, and in this car were boatmen going home to vote, and smoking was going-on, as is usual there. The conductor, Tyler, came along, took up Mrs. Manson’s ticket, and said something to her about going into the next car. Mrs. Manson, the mother,. *453 •says : “ He tolcl me, ‘ Madam, you are iu the wrong car; ’ -said, ‘You must change car next station; it will be more •comfortable for you and your little girl.’ I told him I never was on the car before; I did n’t know anything about the ears — to go in the car; I never was on the car till that ■day.” Mrs. Manson was a French woman, though she had been in this country thirty years. On cross-examination, .she speaks thus :
“ Q. What next did he do or say to you ?
A. He told me, ‘ Madam, you are in the wrong car; ’ that is the way he said to me. ‘ You must change car at the next station ; it will be more comfortable for you and your little girl.’
Q. Didn’t he say this : ‘You had better change at the next station, when the cars stop, because it will be more ■comfortable for you and your child ? ’
A. No, sir.
Q. Did n’t he say it would be better to change to the ■other car ?
A. No, sir; I did n’t understand him in that way.
Q. You understood him to say to you, to go into the ■ •other car at the next station ?
A. Yes, sir. He said change cars at the next station.
Q. That it would be more comfortable for you ?
A. Yes, sir.
Q. That is the reason he gave ?
A. Yes, sir.
Q. Did he say anything else to you ?
A. No, sir.
Q. That is all he did say to you ?
A. Yes, sir.”
According to the child, the conductor spoke thus:
“ A. He said, ‘ Madam, you are in the wrong car — you must change cars at the next station.’
Q. If he said anything more, go on and state it ?
A. Mother said she had never been on the'cars before that day — she did n’t know the difference.
*454 Q. Go on, and state all that was said by the conductor— if anything more was said? ■
A. I do n’t know as there was anything more said then.
Q. What do you say the conductor said — -just give us the-words again ?
A. He said, £ Madam, you are in the wrong car — you must change cars when you get to the next station;’ and G-alion was the next station then.
Q. Did he say Galion would be the next station?
A. He did n’t say.
Q. Was the cars going at that time f
A. Yes, sir; they were going.”
In answer to a question, as to what reason the conductor gave for their changing cars, she replied that he said it was the smoking-car; also, that he said the rear car would be more comfortable. In her • cross-examination she speaks thus:
“ Q. Tell the jury, then, what he said and what your mother said ?
A. Well, he said, ‘Madam, you are in the wrong car— wb.en you get to the next station you must charge cars.. Then,’ he said, ‘ it will be more comfortable.’
Q. More comfortable for you and your mother?
A. Yes, sir.
Q. That is the reason why he said you must change at. the next station ?
A. Yes, sir.”
The conductor’s statement is as follows :
“ Q. What occurred between you and the mother, if anything ? State all that was said by you to her or by her to-yon?
A. I asked for her ticket, and she passed me a ticket. I canceled it and returned it to her, remarking, at the same-time, that it might be pleasanter for her in the next car back of the one she was occupying, as there were some-gentlemen there smoking at the time. If she wished she could do so when the train stopped at the next station. She made no reply, but looked up at me as though she did *455 not understand me. I, of course, wished to have her occupy the other car, and repeated to her what I had said before; and as she did not seem to understand me, I concluded she must be some foreigner, who did not understand the language, and I passed on.”
It will be seen, that though these statements may vary in phraseology, they are not substantially different. Mother and child put it as a command or direction to go into the other car when they arrived at the next station, Galion. The conductor gives it as though it were rather an intima-, tion or suggestion. But, under the circumstances of the case, a suggestion might well have seemed to the mother as an equivalent, if not to a command, at least to a direction, from one in authority. The conductor was the chief officer of the train. Mother and child had never been on a railroad before. The conductor desired them to make the change, and they would naturally think it was their place to comply with his wishes.
If, however, there be a difference, the jury were warranted in taking the* statement of mother and child, if they saw fit to do so. The accident occurred at Galion. The train arrived at that point about a quarter before seven in the evening, when it was dusk. Some say it was getting quite dark, and about time for lighting the lamps. As the train approached Galion, and began to slow up, some one called out “ Galion station,” as is customary for brakemen to do. Upon this the mother rose from her seat, to go to the car next in the rear. She went to the door of the car and stopped a short time. Others went out, and supposing the train had stopped, the mother took the child by one hand and her carpet-sack in the other, went out on the platform, and stepped across to the next car. As the child' attempted to make the crossing, both mother and child say there was a jerk of the train, and the child fell between the cars. The hind truck of the last car cut off both arms— one at the shoulder, the other above the elbow.
There is considerable conflict in the testimony as to whether the cars had actually stopped at the moment the *456 ■child fell, or whether they had stopped and started again, or whether they were running very slowly. It may be that the train had momentarily stopped and then moved od again; but that they had not finally ceased motion is show:., by the fact that two ears passed over the little girl, and when the train finally rested, she was fifteen or twenty feet in the rear of the last car. It is certain the movement was very slow. The train was running through the town, was nearing the depot, and the train men were already taking ■off baggage.
That it was moving quite slowly is shown by this further fact: Between the second and third or last car was a brakeman. He had set the brakes on both these cars, those ■of the last car remaining set till the train finally stopped. But evidently thinking the train would not reach the spot ■desired, at the rate at which they were moving, he threw off the brake of the second car. Shortly after this — a very brief space of time — he says he saw an object under the train, but did not know what it wTas. Pie speaks thus:
“ Q. How soon after you let the brake off before you saw7 this object under the train that you did n’t know what it was?
A. I could not say just exactly how7 soon.
Q. I will ask you if it wasn’t but a moment — before you let that brake off — before you, in passing, saw this object that you supposed w7as this little girl?
A. I could not say — a moment or two moments, or three.”
The distance between the cars is from two to three feet. Of course this distance may be varied. At one moment it may be a few inches, and a jerk of the train may suddenly open it a foot or two almost instantaneously. Both mother and child say that it was a jerk that threw the child under. The mother says the jerk occurred just after she had got across; that after she had stepped over, and just as the child stepped, “ it jerked her away; it jerked her out of my hand between the cars.” The child says : “ Just as I went to make my step the cars jerked apart, and I went under.” Remembering, now, that the brakeman says he *457 ■threw off the brake on the ear upon which the child was •stepping, and a moment or so after saw an object under the train, it seems probable that just as Josephine was in the act of making the step over this chasm, the movement of the brake occasioned the jerk which threw her to the ground.
What is the law, with regard to contributory negligence, will hereafter be considered. We will now consider the fact of contributory negligence. Whether, under the circumstances, mother and child, one or both, were implicated to such a degree as would prevent a recovery on behalf of the child.
First. As to the child. As has been stated, she was between eight and nine years of age. It -would be difficult for us to determine, from the mere fact of her age alone, what degree of intelligence she possessed, or whether she had judgment and intelligence sufficient to be chargeable with what is called contributory negligence — a phrase implying that a party was not old enough to know what it is to be careful, and the reverse. The jury before whom she testified, might have thought from her appearance and demeanor, she was not capable of such discrimination, four years before, when the accident happened, and so could not •be charged with negligence on her own account. Lest we be misunderstood, let us here remark that a defendant is not to be held responsible for those actions of immature years, which, if committed by an adult, would be a clear •case of contributory negligence, on the ground -that the child is not chargeable with such negligence. An infant two years aud a half old, just learning to walk, is in a train going forty miles an hour. Seeing a door of the car open, and unconscious of danger, it toddles out on the platform aud rushes off. Unless attributed to design, this would be negligence, incapable of being characterized by words, in one of maturer years; but it can not be so said of the child, who knew no better. And yet the railroad company might not be responsible for the consequences of such a disaster, not because the child was chargeable with contributory *458 negligence, but simply because the company itself was in no fault. The accident was occasioned by circumstances-over which it had no control and for which it was not responsible. But it is not perhaps necessary for us to decide,, -whether or not Mary Josephine was old enough to be-chargeable with contributory negligence. ' We think all the surrounding circumstances take that question out of' the case.
Eirst, the child was in the presence and under the immediate control of her mother. As was dutiful, she seems to-have done just what her mother told her to do. Her mother 'had taken her hand, and was leading her along, at the very moment she fell. The child did not act from her own volition ; at no time was she a free agent, following her own impulses. Had she iudeed disobeyed her mother — had she left her side, and rejecting her guidance, rushed oiit of the-ear and fallen into peril, she might have been responsible for the consequence. But she did nothing of this. She-simply followed directions, and we are not as yet prepared to characterize mere filial obedience as contributory negligence.
Again, the whole case seems to have been tried upon the-theory, that the negligence, if any, should be charged upon the mother and not upon the child. Defendant’s answer-speaks thus:
“ That after the speed of said train had been slacked, up so as to enable it to stop, and before it had stopped, or arrived at the station and usual stopping place,, and while the train was yet in motion, the mother of said plaintiff, without the knowledge of said company, or of theeonductor and agents having charge of the train, undertook to pass from the smoking car aforesaid to the car nest in the rear thereof, taldug the plaintiff with her. That in. so doing the mother of the plaintiff permitted her to fall between the cars, in consequence of which she was run over’ and injured. That the conduct of the mother was careless■■ and grossly negligent, and in violation of the rules of the- *459 company forbidding persons to pass from one car to another while the train was in motion.
“ That the injury to the plaintiff happened by reason of her mother attempting to pass with the plaintiff from one car to another while the train was in motion. That the careless conduct of the plaintiff and her mother in the manner aforesaid, contributed immediately to the accident, and was in fact the cause thereof.”
In its. charge to the jury, the court speaks of the contributory negligence of the mother. The defendants ask a series of charges — second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth — all predicated upon the idea that the child was under the control of the mother, and it was the-negligence of the mother, that was the great matter in controversy. In fact, the argument of defendant’s counsel, pursue the same line of thought. Eor iftstance, it is said r “ This girl was not a child in arms — she was about nine years of age, endowed with as perfect power of locomotion as an adult; all she could lack more than an adult was a guide to her judgment, and that she had in her mother, upon whom nature had conferred that right and duty ; therefore-it was no negligence in the defendant that she was left to-the guidance of her mother.”
This indicates that the mother was the person who-assumed the responsibility, and that the consequences-should not be charged upon the daughter. And again,, counsel for the company say :
“¥e elaiih further that, on plaintiff’s own testimony, Mrs. Manson was guilty of negligence, and •brought her daughter into danger, in a manner which the defendant’s employes could not reasonably have foreseen, and that the accident was not occasioned by the negligence of defendant at all.” The italics are those of the counsel. Mrs. Manson was the person who was guilty ; she brought her daughter into-danger, not the daughter herself. Still again, defendant’s counsel urge:
“Third. That the injury thus sustained by the plaintiff was caused by the reckless and dangerous act of the mother *460 ■'in compelling the child to pass from one car to the other while the train was in motion and was being checked up for a halt at G-alion Station.”
To our minds it is clear that the whole course of the -trial, as far as we are able to judge from the record, was upon the theory, that the child being young, and under the control of the mother, the entire proceeding being by the direction of the mother, it was the mother who was to be charged with negligence, and not the child. Contributory negligence of the plaintiff, therefore, is laid out of the ■case.
Then we come to the contributory negligence of the mother. In order to see whether it existed, we must discover the precise fact which constitutes such negligence. ‘The answer says this negligence was the passing from one •car to another while the train was in motion. The argument of counsel insists upon this fact as the fact of negligence.
The following, we think, would be a case of negligence: A train is going forty miles an hour. The platforms are old-fashioned, where the cars are one moment close together, the next two or three feet apart. With the pitching and tossing of a train thus moving, for an inexperienced traveler to attempt of his own motion to pass from •one to another, we think might be designated as an act of negligence. And should a party fall, under such circum•stances, it might be said that the accident was the result of his own recklessness. Still it can not be claimed that going from one car to another while the train is in motion, is at ■all times and under all circumstances negligence. Shear. & R. on Neg. sec. 285, says: “Moving from one car to another, while the train is in motion, is generally evidence of gross negligence; and a case of urgent necessity must be shown to justify it. But if a passenger does so in obedience to a direction or request of the officer in charge of the train or car, the act may be deemed consistent with proper care, since passengers have a right to rely upon the judgment of the officers of the train in respect to such matters, *461 and are bound to obey the reasonable directions of such officers.”
The present is much like the case of McIntyre, v. Railroad, 37 N. Y. 287, the syllabus of which is: “It is not. negligence in law, for a passenger to follow the direction given by a servant of a railroad company, and to pass from one car to another, while the same are- in motion, for the purpose of finding a seat. "Whether in such ease it was negligence, is a question for a jury.” The cars being-crowded, one of the employes of the railroad said: “ Go forward, there are plenty of seats forward ; go forward if you want seats.” Endeavoring to do so, and in crossing from one car to another, plaintiff’s intestate fell through and was killed. Eullerton, J"., says (p. 293): “ It can not be considered negligence on the part of the person killed, that, she attempted to pass from one car to another, in obedience-to the orders of the defendant. She was not only directed to go"forward into another car, in the night, time, during a storm, and when the train was in motion, but it was necessary for her comfort and convenience that she should do so. . . . She had a right to a seat, and it was the duty of the defendant to provide her with one. If, in discharging that duty, they required her to perform an act which was perilous in itself, and in doing which she lost her life, the negligence, if any, which that act involved, should be imputed to the company alone. The rule that contributory negligence will prevent a recovery, by the party suffering the injury, ought not to be applied to such a case. It would seem to be manifestly unjust to characterize as negligence the act of yielding obedience, under such circumstances, to the requirements of the party inflicting the injury, and to hold, as between the parties themselves, that it should deprive the party injured of all legal redress. It would be a novel, as well as a dangerous rule, to hold that a railroad company should enjoy immunity from liability, when the act which occasioned the injury was undertaken under its-direction, and was one which the passenger must perform- *462 in order to procure the seat, which the company was bound to furnish.
“I admit that passing from one car to another in a dark .and stormy night, when the train was in motion, incumbered with baggage, and having charge of an aged person, was an act fraught with imminent peril, and if done without sufficient cause, one involving great negligence.
“ But having been undertaken at the request of the company, it is to be regarded as their act, and attempted at their risk. Unless this view of the case is adopted, railroad companies may be guilty of the grossest wrongs without incurring liability. In performing their contract,-they may require a feeble and inexperienced person to incur fearful risks, and then claim to be without fault in law, on the ground that the passenger, who may have suffered the injury, was negligent in following their reckless direction. The very statement of such a case suggests the necessity of .■so administering the law as to obviate so great an evil.”
These remarks are quite apposite to the case under consideration.
Was Mrs. Manson, then, guilty of negligence in attempting the crossing, under the circumstances. Railroad trav•eling was new'to her, as it was her first experience. She had been told by the officer in command to go into the ■other car, or at least been informed that there was her proper place. It was dark, not perhaps completely so, but ■sufficient to increase the danger. She was to change at Galion. The brakeman called out that station, and it was notice to her that the time had come to move. She smarted to the door. She waited before she went out, allowing •others to precede her. The train was moving very slowly. It might here be remarked, that even to experience, nothing is more deceitful than the movement of a railroad train, and nothing more difficult than to tell, precisely how fast it is going. Mrs. Manson repeatedly says she thought the cars had stopped, and she did not know they were moving .at all, when she crossed. Having been directed by the conductor, to do this, unable from the darkness and her own *463 Inexperience to tell whether the cars had stopped or not, but supposing they had, can we say her act was negligence, when neither conductor nor other trainman was at hand to •assist, or to advise her inexperience that motion had not sufficiently ceased so as to render her compliance with ■orders safe?
If it be said that she should not have crossed until the •cars had stopped, and if she made a mistake about the fact of stoppage, that mistake should not be charged upon the •company, it is replied that the company directed the act which made the mistake dangerous. They should not impose upon her the decision of a dangerous question, and visit upon her the consequences of an error of judgment'. Had the conductor or a brakeman been there, they cbuld have told her the cars had not stopped, and she would have relied upon them.
It is also urged that Mrs. Manson should have waited till some one came to help her. Erom the evidence, had she •done so, she might have been standing there now. It does not appear that any body on the train thought of going to her aid. The conductor was quietly engaged in his own reflections, which do not appear to have included these two passengers. One brakeman was engaged in manipulating the brake, which seems’ to have been the moving cause of the disaster. The second brakeman is not accounted for. 'It is not intimated that any one of these was instructed or proposed to themselves to assist These parties. It is true the colored porter says he did, but contradicted as he is, if the jury did not see fit to place implicit reliance upon his statements, we do not know that we are prepared to impeach their discretion.
Mrs. Manson is not therefore justly chargeable with negligence, in not waiting an indefinite length of time, for assistance from some supposable employe of the company, who did not, at any time, entertain any notion of proffering his services.
Not being able, therefore, to charge contributory negligence upon the mother, we then ask: Was there negligence on *464 the part of the railroad company ? After what he had said,., the conductor must have known that the mother would attempt the crossing as soon as they reached Galion. The conductor doubtless knew that the brakeman would do as is generally done, when they open the door and call the name of the station, before the station is actually reached. It should have occurred to him that this announcement would probably mislead Mrs. Manson into starting sooner upon her undertaking than it was safe to do. It was not the ease of a man accustomed to travel. It was a woman, for the first time upon the rail, incumbered with a carpet sack, and a child. Just here, the impulses of politeness-mark what it is the duty of a railroad conductor to do under the circumstances. The act is spontaneous, among Americans, to help women and children, when on trains, and unattended. It was the duty of the conductor, after-having said what he did, to suppose that she would attempt the crossing, and to be at hand to help her. It is useless to say that this officer can not be everywhere, doing everything. If he had been fairly occupied with other things justly demanding his attention, he could have shown it as-an excuse. But this is not pretended. He was simply sitting in the car, doing nothing. This is his testimony : “ I passed on and collected the balance of tickets of the train, and returned to the middle passenger coach immediately in rear of the smoking-car, and took a seat. On arriving at Galion I arose and went to the door, and as I was about to step out I met the plaintiff’s mother on the-front platform of the second passenger car, and that is the-first I saw of her after taking her ticket.”
There was no reason, therefore, why he should not have-been on hand to help the woman.
In the case of MacIntyre v. R. R., supra, it was significantly remarked by Davies, Oh. J., that, “It was a dark, night, and it did not appear that any of the employes of the company were aiding or assisting the passengers in-their passage from one car to another.” M. & C. R. R. Co., v. Whitfield, 44 Miss. 467.
*465 That some of the train men were aware of their proper duties, is evidenced by the testimony of Major Johnson, the porter, who says that in conversation with Mrs. Manson, “I think I said I would assist her into the next car back.” And, again, “ I told her I would assist her into the next car back when we got to Gallon.” lie further states that when the train stopped, “As I told her I would assist her to the next coach back, I came out for the purpose of assisting her to the next car back.”
Mrs. Manson denies having had any conversation with the porter whatever. Whether it occurred or not, it- shows that he was conscious of the fact, that some one on behalf of the company should have been present to assist Mrs. Manson in the dangerous undertaking which the company had enjoined upon her.
But it does not appear that the conductor took any steps whatever to aid these parties! He directed no brakeman or other employe to be present and help. He was not there himself, and from all that can be discovered, after he took Mrs. Manson’s ticket and gave her directions to move, neither woman nor child ever entered his head again.
Indeed, by his own testimony, he shows that he did not purpose assisting her. He says, speaking of the time when he went out of the ear at G-alion :
“Q. Eor what purpose did you go out of your car at that time, when you met Mrs. Manson on the platform?
A. So as to assist passengers in getting off when the train came to a stop.
Q. Was that the only purpose you had.
A. It was.”
Nor can it be said in his defense that he was justified in believing that they would not attempt to cross till the cars stopped, and he would be on hand to help. Suffice it to say that then the danger would have been over, and his assistance would have been unimportant. If any duty at all attached to his position, it was to be present when his presence would have prevented the danger — when, his ex *466 perience could have told her that the cars were still moving, and it was unsafe to cross. In other words, he should have taken such precautions as would have guarded against the fatal consequences of his own order.
But, again, the conductor was sitting in the middle passenger car. It was to this car, in rear of the one where they were, that Mrs. Manson and daughter were making their way. On approaching Gabon, the conductor arose and went out upon the forward platform, when he met Mrs. Manson. We now quote his testimony:
“A. As I opened the door she was on the platform, as I stated before, and she was partly turned round, looking at the rear of the front car which she had just left (she cried, ‘My child!’ or said something about child), aud I looked around, but I saw nothing of her child. I thought perhaps something had happened, and stepped off and walked back to the rear of the traiu. At the time I came out of the car and stepped off, it was moving slowly. As I approached the rear car I noticed something in the middle of the track, under the rear car, but it was so dark that I could not distinguish what it was, and as I approached, the object made some sort of a motion, as if rolling over or forward, which •brought it in contact with the wheels of the rear truck of the rear car, and at the same time I heard a scream, and knew that it was the little girl, and that she had been run over by the ear. The train stopped after the rear car had passed about ten or fifteen feet past the little girl, as near as I can remember. I picked up the little girl and carried her into the sitting-room of the station-house.”
When he came out of the car, if the conductor had just reason to suppose that the child was under the train, and by the use of ordinary means could have prevented the disaster, his failure to do so is negligence, for which the company is responsible. Bid he have reason to suppose, when he came out on the platform, that the child was under the train ?
When he met Mrs. Manson on the platform, just having crossed, he must have remembered the directions he had *467 given her. He must have known that she was there in obedience to those directions. He must have known that she had started to make the crossing, in company with her daughter. He hears her exclaim, “ My child!” He looks around and the child is missing. There is but one place for her to be — upon the train, or under it. He ought to have known where she was. He ought to have known it, just as John Allback did, who came out on the same platform to get off, and says : “ Just about the time I was going to step off, some woman spoke to me; the woman had stepped across onto the platform of the car I was on, and was in the act of opening the car door when she spoke to me. She asked me where her little girl was, or if I had seen her little girl. I told her I had n’t seen her, but if she had come out there she had dropped down through the cars.” That he ought to have known it, is shown by the fact that he gets off" of the train and goes to seek her. He goes directly to the right spot and there he finds her.
What, then, could this conductor have done, had he done it at the’right time, to prevent this disaster ?
It will be remembered that two cars passed over the child, and she was picked up ten or fifteen feet behind the rear ear. It oeems from the above testimony of the conductor, that it was the hind trucks of the last car that cut off" the girl’s arms. The cars are about sixty feet in length, so that the train must have moved over a hundred feet before the hind trucks reached the point of the catastrophe. If, therefore, when the conductor came out of the car, saw the mother alone, and heard her cry, it flashing upon him that the child v7as under the train, had he pulled the bell cord, a sound from the whistle would have stopped the cars before they had moved twenty feet, certainly before they had moved a hundred, and the hind trucks never would have reached the girl. Had he given this signal, the first which a conductor gives, as by intuition, in the moment of peril, the engineer would at once have known that there was unusual danger. He would have known that it must be something extraordinary that called a halt *468 just at that moment, when the final stop was, at all events, but a few seconds ahead, and steam would have arrested all progress upon the instant.
Or, again, when the conductor came out on the platform, his-hand was within reach of the brake. That brake had just been thrown oft’. Had he applied it with that promptness and vigor, which is called for when life and limb are at stake, in all probability the disaster would have been avoided.
We have thus far discussed the case as upon the motion for a new trial, and Avhether the verdict is so palpably against the weight of evidence as to justify the interference of a court of error. We think it evident that Mrs. Manson attempted the change from car to car in consequence of what the conductor said to her. It was a dangerous attempt, when it was dark, or nearly so, while the train was in motion, and it was dangerous as the result proved. We can not think she was in fault, in view of the conductor’s remarks to her. Nor do we think her culpable for an error as to whether the cars had stopped pr not, in view of the fact that neither conductor, brakeman, nor porter' was present to aid her judgment, by a better experience. Nor do we think the conductor without blame, in leaving the woman to act entirely by herself, or in the further fact of taking no measures to'stop the train directly he must have divined what had happened. There was testimony warranting the jury in coming to the conclusion indicated, and we can not say that they have so clearly erred as to justify us in setting aside the verdict, as being plainly incompatible with the evidence.
The defendant below asked the court to give some twenty-one special charges. The main point insisted upon was that the attempt to cross from ear to car, under the circumstances, was such contributory negligence as would prevent a recovery. The proposition was put in a variety of shapes, but this is the .gist of the whole matter. Perhaps this phrase of “ contributory negligence,” of which so much is said in the books, is, after all, only an expression, useful in *469 that it affords a criterion enabling us'to arrive at the main question, the neglig-ence of defendant. If a plaintiff is guilty of such negligence as prevents a recovery, clearly it must be that the accident was not occasioned by the uegligence of defendant, and saying that plaintiff is in fault, is only affirming that defendant is not. This applies to the exact point of negligence, which occasions the accident and which is termed the proximate cause. This cause can be through the fault of but one, and the facts which fasten this fault upon one, at the same time relieves the other of responsibility.
In determining, therefore, whether plaintiff or her mother were chargeable with that contributory negligence which ■prevents recovery, it is to be ascertained whether their acts brought about the injury, or whether it might have been prevented by defendant in spite of these acts.
All the negligence alleged against the plaintiff is this act of crossing. Did this act contribute to the injury in that sense which renders unnecessary the consideration of any further co-operative negligence on the part of the defendant? Had the cars been stopped upon the instant the child fell through, this accident would not have happened. She might have been otherwise hurt, but her limbs would not have been cut off by the rear trucks of the hind car. This must be evident. If, then, notwithstanding what plaintiff and her mother did, the accident might have been prevented by the exercise of due care on the part of defendant, they must be held responsible; for a failure to exercise such care is negligence. And to this question it comes at last. The court charged the jury that they must find such negligence, or there could be no recovery. The court said: “ The substantial question for you to determine is whether this injury, w-hich resulted from the falling through between those cars, was the result of any carelessness on the part of this railroad compauy, — the result of their omitting to do anything they were bound to do, or of doing anything in a careless manner, in a way that the law did n’t author *470 ize them to do it, so as to endanger the safety of this plaintiff’ or' other passengers.”
Upon the subject of contributory negligence, the court charged, in accordance with the rule as laid down in the Snyder case, that the negligence of the mother can not be imputed to the child. The rule is otherwise in England, Maine, Massachusetts, New York, and Indiana (Wharton on Negligence, sec. 311); but since Snyder’s case it is not an open question in Ohio.
Counsel ingeniously contend that there is a distinction between cases where the child is injured upon a street or thoroughfare, and where it is in the cars, through the act of its parent or guardian, and cite the case of Waite v. N. E. R., 5 Jurist, pt. 1, p. 936. In that case, Pollock, C. B., says he can see no distinction between a child, in the custody of another, being injured, or a package of goods damaged under similar circumstances. We think such distinction can be perceived. If the goods are injured, and the custodian is in fault, he can not recover, but the goods themselves can not bring an action in the nature of things. Now, though the child may sue, notwithstanding its custodian is in fault, yet the custodian can not, for his fault is a good defense. This is shown by the two Snyder cases in our state. In 18 Ohio St. 399,the child recovered, the negligence of its custodian not being imputable to it. But in 24 Ohio St. 670, the father brought an action for the same injury, in which he sought to recover for the loss of the child’s services. The syllabus of that case is : “ Where an infant child, intrusted to the care and custody of another by the father, is injured through the negligence of a railroad company, the custodian of the child also being guilty of negligence contributing to the result, although the infant may maintain an action for such injury, the father can not — the negligence of his agent, the custodian of the child, being in law the negligence of the father.”
The distinction, therefore, between this and the English caséis the difference between'a child and a package of goods. The injury to the child is an injury to its custodian *471 or father, and to itself; the injury to the goods is to its owner or custodian alone.
Many of the charges asked by defendant below, do involve the doctrine that the child is to be chargeable with the consequence of its mother’s imprudence, which is imputed negligence. For instance, the first charge is to this effect — that if plaintiff' and her mother, after having been admonished of the danger, still attempted the crossing, and so contributed to the injury, plaintiff can not recover. If this crossing was thus dangerous, the imprudence or carelessness was certainly in part, if not altogether, that of the mother, and to say that this would prevent recovery, is simply imputing negligeuce.
So the fourth charge :
“ 4. That while the mother and child were both together, the one under the charge and control of the other, if their united act in leaving a place of safety and passing from car to car while the train was in motion caused or contributed to the injury, such conduct (not omission to act) would prevent a recovery.”
If the “united” act occasioned the injury, it was a “ united” negligence, and whatever portion of it belonged to the mother, this charge still imputes to the child.
The sanie remarks also apply to the sixth charge, and that portion of the seventh which was refused. It may be generally observed, upon the various charges asked upon this point, that, more or less directly, they seek to charge upon the child the mother’s fault, aud were therefore properly refused.
The 14th charge asked was as follows:
“14. That the right to recover damages for injuries to the plaintiff’ depends upon two concurring facts: First, the party claimed to have done the injury must be chargeable with some degree of negligeuce. Secondly, the party injured must have been entirely free from any degree of negligence which contributed to the injury.”
We think the reply of the court to this request was entirely proper:
*472 “ 14. I refuse to give you that instruction, gentlemen, and I suppose the correct law upon the point has already been stated to you. I have endeavored to explain to the jury (and the parties will have the benefit of an exce|)tion if I am wrong), that the negligence of the mother can not be imputed to the child. I have also attempted to explain to you that if you find she is of such tender years that she would not be aware reasonably of the danger in passing from one car to the other, negligence could not be imputed to her. But I am not saying to you such is the fact. It is for you to sa}T whether this child, of the age she is shown to be, and the circumstances in regard to her intelligence as they have been detailed to you in the evidence, whether she, at the time, had the discretion and understanding to be aware of the danger. If she had not, negligence could not be imputed to her, and she would be entitled to recover against the defendant in case she proves the defendant was negligent.”
Without specifying further, enough has been said to show our vieivs, and that the law as laid down by the court was free from error.
Errors are assigned, also, upon .certain rulings of the court, at the trial, with regard to questions of evidence. We have examined the points made, and do not find any such error as would justify us in reversing the judgment. Upon the whole case, therefore, the judgment is affirmed.
Scott, J., dissented.